904 F.2d 1335
 SELDOVIA NATIVE ASSOCIATION, INC., Plaintiff-Appellant,
v.
Manuel LUJAN, Jr.,* individually and in his
capacity as Secretary of the Interior of the United States;
United States of America; Theodore G. Smith, individually,
and in his capacity as Director of Forest Land and Water
Management for the State of Alaska; Eunice M. Berglund;
Margaret A. Leis; Theodore A. Richards; Charlotte E.
Calhoun; David Vanderbrink; Geraldine Faller; Allan B.
Billings; Judith Miller; Raymond E. Miller; Elizabeth
Cummings; Gale Forrest Kay; William Findlay Abbott; Amy
K. Bollenbach; Susan Campbell; Harry F. Kroll, II; Vivian
MacInnes; Daniel Winn; Nels Pilskog; Keith Richard
Saville, et al., Defendants-Appellees.
 No. 89-35295.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 6, 1990.
Decided May 31, 1990.
 
 Roger W. DuBrock, Law Offices of Roger W. DuBrock, Anchorage, Alaska, for plaintiff-appellant, Seldovia Native Ass'n, Inc.
 Madeleine R. Levy, Asst. Atty. Gen., Anchorage, Alaska, for defendant-appellee, State of Alaska.
 David C. Shilton, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for Federal defendants-appellees.
 Appeal from the United States District Court for the District of Alaska (Anchorage).
 Before KOELSCH, ALARCON and RYMER, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 The Seldovia Native Association (SNA) filed this action for declaratory and injunctive relief on January 12, 1981. An amended complaint was filed on April 17, 1987. SNA sought a declaration that the construction of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. Secs. 1601-1629e, adopted by the Secretary of the Interior (the Secretary) was invalid. The Secretary's construction of ANCSA validated the State of Alaska's grant of leases with purchase options on lands subsequently claimed by SNA pursuant to ANCSA.
 
 
 2
 SNA and the federal government filed cross-motions for summary judgment. The State filed a motion to dismiss the action. On February 13, 1989, the district court granted summary judgment in favor of the federal defendants and the individual defendants. The cause of action alleged against an individual defendant sued in his official capacity as a state officer was dismissed as barred by the eleventh amendment. Final judgment was entered on March 14, 1989. SNA filed a timely notice of appeal on April 6, 1989.
 
 
 3
 We must decide whether the purchase options granted by the State of Alaska are "valid existing rights" not subject to selection by Native Alaskans under ANCSA. SNA contends that purchase options are not included within the savings provisions of ANCSA. The State maintains that in enacting ANCSA Congress intended to preserve all prior property interests, and, therefore, purchase options granted by the State of Alaska under the Alaska Statehood Act are "valid existing rights."
 
 PERTINENT FACTS
 
 4
 In 1958, Congress enacted the Alaska Statehood Act, Pub.L. No. 85-508, 72 Stat. 339, 340 (1958) (codified at 48 U.S.C. note prec. Sec. 21 (1982)). The Alaska Statehood Act authorized the State of Alaska to select acreage from public lands that were "vacant, unappropriated, and unreserved at the time of their selection." Alaska Statehood Act Sec. 6(b), 48 U.S.C. note prec. Sec. 21. Section 6(g) of the Alaska Statehood Act provided:
 
 
 5
 Following the selection of lands by the State and the tentative approval of such selection by the Secretary of the Interior ... but prior to the issuance of final patent, the State is hereby authorized to execute conditional leases and to make conditional sales of such selected lands.
 
 
 6
 Id. Sec. 6(g). Pursuant to section 6(g), the State created the "open-to-entry" (OTE) program. Alaska Stat. Sec. 38.05.077 (1968). Under the OTE program, individuals could lease up to five acres of state land classified as "open-to-entry." Id. Sec. 38.05.077(3), (7). The lessees were granted an option to purchase the land. The option could be exercised by satisfying two conditions: conduct of a survey and payment to the State of the fair market value of the land as of the date of entry. Id. Sec. 38.05.077(4), (8). These options are referred to as "conditional purchase options" or "OTE purchase options." Under the implementing regulations, the Department of the Interior issued "tentative approval" to the State only "after determining that there is no bar to passing legal title ... other than the need for a survey of the lands or for the issuance of patent or both." 43 C.F.R. Sec. 2537.3(d).
 
 
 7
 In 1959, the State filed selections for land in Kachemak Bay, near the Village of Seldovia. The Bureau of Land Management (BLM) tentatively approved these selections in 1960, 1964, and 1966. The State classified the land as "open-to-entry" under Alaska Stat. Sec. 38.05.077. Between 1968 and 1972, the State issued OTE leases with conditional purchase options to the individual defendants in this case.
 
 
 8
 Congress passed ANCSA on December 18, 1971, to settle Alaskan Natives' aboriginal claims to the land and resources of Alaska. H.R.Rep. No. 523, 92d Cong., 1st Sess. 1-4, reprinted in 1971 U.S.Code Cong. & Admin.News 2192, 2192-96. Section 4 of ANCSA, 43 U.S.C. Sec. 1603, provides that all prior conveyances of land under federal law or tentative approvals under section 6(g) of the Statehood Act operated to extinguish aboriginal title at the time the conveyance was made or approval was given, and all remaining claims by Native Alaskans based on aboriginal right, title, use, or occupancy of the land were extinguished as of December 18, 1971. United States v. Atlantic Richfield Co., 612 F.2d 1132, 1134 (9th Cir.), cert. denied, 449 U.S. 888, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). In consideration for the relinquishment of claims based on aboriginal title, Congress granted to Native Alaskans $962,500,000 and 40 million acres of land. Id.; see also H.R.Rep. No. 523, 92d Cong., 1st Sess. 2, reprinted in 1971 U.S.Code Cong. & Admin.News at 2193. ANCSA established a process whereby land would be withdrawn from selection by the State, made available for selection by Native Alaskans to fulfill their allotment under ANCSA, and then conveyed to Native Alaskans. See 43 U.S.C. Secs. 1610(a), 1611(a)(1), 1613(a).
 
 
 9
 The land granted to Native Alaskans was to come primarily from public lands, defined as "all Federal lands and interests therein located in Alaska," with the exception of lands used for federal installations and tentatively approved land selections made by the state pursuant to section 6(g) of the Alaska Statehood Act. 43 U.S.C. Sec. 1602(e) (1982). Section 11(a)(1) of ANCSA provides that certain public lands surrounding Native Alaskan Villages are withdrawn from all forms of appropriation under the public land laws and from selection under the Alaska Statehood Act:
 
 
 10
 The following public lands are withdrawn, subject to valid existing rights, from all forms of appropriation under the public land laws, including the mining and mineral leasing laws, and from selection under the Alaska Statehood Act, as amended:
 
 
 11
 (A) The lands in each township that encloses all or part of any Native village identified pursuant to subsection (b) of this section;
 
 
 12
 (B) The lands in each township that is contiguous to or corners on the township that encloses all or part of such Native village; and
 
 
 13
 (C) The lands in each township that is contiguous to or corners on a township containing lands withdrawn by paragraph (B) of this subsection.
 
 
 14
 The following lands are excepted from such withdrawal: lands in the National Park System and lands withdrawn or reserved for national defense purposes other than Naval Petroleum Reserve Numbered 4.
 
 
 15
 Id. Sec. 1610(a)(1). Some of the land available for conveyance to Native Alaskans was to come from tentatively approved land. 43 U.S.C. Sec. 1610(a)(2). Section 11(a)(2) provides that tentatively approved land described in section 11(a)(1) was withdrawn from further appropriation and from the creation of new third-party interests by the State:
 
 
 16
 All lands located within the townships described in subsection (a)(1) hereof that have been selected by, or tentatively approved to, but not yet patented to, the State under the Alaska Statehood Act are withdrawn, subject to valid existing rights, from all forms of appropriation under the public land laws, including the mining and mineral leasing laws, and from the creation of third party interests by the State under the Alaska Statehood Act.
 
 
 17
 Id. Sec. 1610(a)(2). (emphasis added). As a result, the State could not grant OTE leases under section 6(g) of the Statehood Act after the passage of ANCSA. Rights previously granted, however, were protected as "valid existing rights." See Id. Secs. 1610(a)(1)-(2).
 
 
 18
 ANCSA established Native Village corporations to hold, manage, and distribute lands granted pursuant to ANCSA on behalf of Native Alaskan Villages. Id. Secs. 1602(j), 1607. Section 12(a)(1) allowed the Native Village corporations up to three years after December 18, 1971, to select land withdrawn under section 11(a). Id. Sec. 1611(a)(1). Section 12(a)(1) provides, in pertinent part:
 
 
 19
 During a period of three years from December 18, 1971, the Village Corporation for each Native village identified pursuant to section 1610 of this title shall select, in accordance with rules established by the Secretary, all of the township or townships in which any part of the village is located, plus an area that will make the total selection equal to the acreage to which the village is entitled under section 1613 of this title. The selection shall be made from lands withdrawn by section 1610(a) of this title....
 
 
 20
 43 U.S.C. Sec. 1611(a)(1).
 
 
 21
 Section 14(a) provides that, upon proper selection of withdrawn lands, the Secretary must convey to the Native Village corporation a patent to the surface estate for that land. Id. Sec. 1613(a). All such conveyances to Native Village corporations are subject to valid existing rights:
 
 
 22
 All conveyances made pursuant to this chapter shall be subject to valid existing rights. Where, prior to patent of any land or minerals under this chapter, a lease, contract, permit, right-of-way, or easement (including a lease issued under section 6(g) of the Alaska Statehood Act) has been issued for the surface or minerals covered under such patent, the patent shall contain provisions making it subject to the lease, contract, permit, right-of-way, or easement, and the right of the lessee, contractee, permittee, or grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him. Upon issuance of the patent, the patentee shall succeed and become entitled to any and all interests of the State or the United States as lessor, contractor, permitter, or grantor, in any such leases, contracts, permits, rights-of-way, or easements covering the estate patented, and a lease issued under section 6(g) of the Alaska Statehood Act shall be treated for all purposes as though the patent had been issued to the State. The administration of such lease, contract, permit, right-of-way, or easement shall continue to be by the State or the United States, unless the agency responsible for administration waives administration. In the event that the patent does not cover all of the land embraced within any such leases, contract, permit, right-of-way, or easement, the patentee shall only be entitled to the proportionate amount of the revenues reserved under such lease, contract, permit, right-of-way, or easement by the State or the United States which results from multiplying the total of such revenues by a fraction in which the numerator is the acreage of such lease, contract, permit, right-of-way, or easement which is included in the patent and the denominator is the total acreage contained in such lease, contract, permit, right-of-way, or easement.
 
 
 23
 Id. Sec. 1613(g). The Secretary is authorized to issue regulations necessary to carry out the purposes of ANCSA. Id. Sec. 1624.
 
 
 24
 In May 1974, SNA submitted selections for lands surrounding the Village of Seldovia pursuant to 43 U.S.C. Sec. 1611(a). These selections did not include the OTE lands. In September 1974, the BLM notified SNA that SNA was required to select the OTE lands to ensure the "compactness" of SNA's selection.
 
 
 25
 In October 1975, the BLM vacated its tentative approval of the OTE lands and approved their conveyance to SNA, subject to valid existing rights. This decision was appealed by SNA, the State, and several individual lessees to the Alaska Native Claims Appeals Board (ANCAB). ANCAB ruled that, although the OTE leases were protected by section 14(g), 43 U.S.C. Sec. 1613(g), the purchase options did not survive conveyance to Native Alaskans. Appeal of Alaska and Seldovia Native Ass'n, Inc., 84 Interior Dec. 349, 375-77 (1977), 2 ANCAB 1, VLS 75-14, 75.15.
 
 
 26
 ANCAB's ruling conflicted with an earlier decision of the Interior Board of Land Appeals, State of Alaska, 19 I.B.L.A. 178 (1975). To resolve this conflict, the Secretary issued Secretarial Order No. 3016 (S.O. 3016), 85 Interior Dec. 1 (1977). The Secretary concluded that conditional purchase options are valid existing rights under section 14(g) of ANCSA, 43 U.S.C. Sec. 1613(g). Id. at 18. As a result, a lessee's right to exercise a purchase option is enforceable against a Native Village corporation. Id. The Secretary determined that S.O. 3016 was not intended to disturb any final administrative decision. Id. at 1.
 
 
 27
 In April 1978, BLM entered an order conveying the OTE land to SNA. BLM determined that S.O. 3016 did not apply to the controversy between SNA and the lessees because its prior administrative decision was final. The State of Alaska appealed this decision to ANCAB.
 
 
 28
 Several Native Village corporations became concerned that S.O. 3016 could lead to a divestment of lands they had selected that were subject to conditional purchase options. Pursuant to their request, the Secretary reconsidered S.O. 3016. On November 20, 1978, the Secretary issued Secretarial Order No. 3029 (S.O. 3029), 43 Fed.Reg. 55287 (1978). The Secretary concluded that purchase options are valid existing rights under section 11(a)(2), 43 U.S.C. Sec. 1610(a)(2). Accordingly, the Secretary determined that OTE lands were not available for Native Alaskan selection. 43 Fed.Reg. at 55288-89, 55291. The Secretary left open the possibility of the retroactive application of S.O. 3029. Id. at 55287. In response, ANCAB suspended proceedings in the State of Alaska's appeal. Order of Suspension, ANCAB VLS 78-41 (January 31, 1979).
 
 
 29
 On March 27, 1980, the Secretary decided that S.O. 3029 applied retroactively to the OTE lands involved in Appeals of Alaska and Seldovia Native Association, Inc., 84 Interior Dec. 349 (1977). Valid Existing Rights Under the Alaska Native Claims Settlement Act: Departmental Manual Release No. 2246, 601 DM 2 (March 27, 1980). Pursuant to this decision, ANCAB ordered BLM to "reinstate tentative approval of the State's selection of such land so that the State of Alaska is able to grant title to [OTE leaseholders holding purchase options] as contemplated by Order No. 3029." Appeal of Alaska, 87 Interior Dec. 366, 367 (1980), 5 ANCAB 4, VLS 78-41.
 
 
 30
 In this action for injunctive and declaratory relief, SNA challenges the Secretary's interpretation of section 11(a)(2). Relying on this interpretation, the district court entered an order granting summary judgment to the federal defendants and the individual defendants. The district court dismissed the claims against the individual state officer as barred by eleventh amendment.
 
 STANDARD OF REVIEW
 
 31
 An order entering summary judgment is reviewed de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989). This court must determine, viewing the evidence in the light most favorable to SNA, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. Tzung v. State Farm Fire & Cas. Co., 873 F.2d 1338, 1339-40 (9th Cir.1989). Whether the eleventh amendment immunizes a state from suit is a question of law that we also review de novo. BV Engineering v. University of Cal., Los Angeles, 858 F.2d 1394, 1395 (9th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1557, 103 L.Ed.2d 859 (1989).
 
 DISCUSSION
 
 32
 The district court accepted the Secretary's interpretation of "valid existing rights" under ANCSA as including open-to-entry leases with conditional purchase options. Accordingly, the district court concluded that land subject to the OTE leases was not available for selection by SNA under section 11(a)(2) of ANCSA, 43 U.S.C. Sec. 1610(a)(2). In this appeal, SNA argues that OTE purchase options do not survive selection by Native Village corporations because they are not "valid existing rights under ANCSA."
 
 I. "Valid Existing Rights" under ANCSA
 
 33
 In considering the administrative construction of statutes that an agency administers, the court must first determine whether " 'Congress has directly spoken to the precise question at issue.' " Tyonek Native Corp. v. Secretary of Interior, 836 F.2d 1237, 1239 (9th Cir.1988) (quoting Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). " 'If the intent of Congress is clear,' " the court must give effect to that intent. Id. (quoting Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. at 842, 104 S.Ct. at 2781). " '[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.' " Id. (quoting Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. at 843, 104 S.Ct. at 2782). The court's starting period thus " 'must be the language employed by Congress.' " Buettner v. Kavilco, Inc., 860 F.2d 341, 343 (9th Cir.1988) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979)).
 
 A. The Plain Language of ANCSA
 
 34
 When construing statutory language, "we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.' " Id. (quoting Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)). We determine the plain meaning of a statute by looking "to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).
 
 
 35
 Congress did not define the meaning of "valid existing rights" in the text of ANCSA. To clarify Congress' intent in using this term, we turn to an examination of the legislative history. Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).
 
 B. The Legislative History of ANCSA
 
 36
 ANCSA's legislative history does not demonstrate that Congress intended that land subject to conditional purchase options granted under the Alaska Statehood Act was available for selection by a Native Village corporation. To the contrary, the legislative history of ANCSA supports the conclusion that conditional purchase options are "valid existing rights." The Conference Report of the House and Senate Committees on Interior and Insular Affairs states that "[a]ll valid existing rights, including inchoate rights of entrymen and mineral locators, are protected." Conf.Rep. No. 746, 92d Cong., 1st Sess. 4, reprinted in 1971 U.S.Code Cong. & Admin.News 2192, 2250. A conditional purchase option would appear to be such an inchoate right. Because conditional purchase options are not expressly referred to in either the statute or its legislative history, however, we turn to an examination of the Secretary's construction of "valid existing rights."
 
 
 37
 C. Administrative Construction of "Valid Existing Rights"
 
 
 38
 The district court accepted as reasonable the Secretary of the Interior's construction of "valid existing rights" under ANCSA. The appellees assert that this deference to the Secretary's interpretation of ANSCA was error, relying on the canon of statutory construction that "statutes benefiting Native Americans should be construed liberally in their favor." Tyonek Native Corp. v. Secretary of the Interior, 836 F.2d at 1239 (citing Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g, 467 U.S. 138, 149, 104 S.Ct. 2267, 2275, 81 L.Ed.2d 113 (1984)). We recently rejected the application of this canon to ANCSA. We stated in Haynes v. United States, 891 F.2d 235 (9th Cir.1989) that "[w]hile this court has recognized this canon of construction, ... it has also declined to apply it in light of competing deference given to an agency charged with the statute's administration." Id. at 239.
 
 
 39
 "To the extent necessary for decision and when presented, the reviewing court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions...." 5 U.S.C. Sec. 706 (1988). Although the judiciary is the final arbiter of issues of statutory construction, an administrative agency's interpretation of a statute it is charged with administering is accorded substantial deference. Haynes v. United States, 891 F.2d at 238-39. We have previously stated that "[t]he principal responsibility for administering the [ANCSA] lies with the Secretary and his interpretations of the statutes are entitled to 'great weight' upon judicial review." Doyon, Ltd. v. Bristol Bay Native Corp., 569 F.2d 491, 496 (9th Cir.), cert. denied, 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978); see also City of Angoon v. Hodel, 803 F.2d 1016, 1026 (9th Cir.1986) (deference is given to Secretary's interpretation of ANCSA), cert. denied, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987). "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding," but only that the agency's interpretation is reasonable and is not contrary to congressional intent. Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 (citations omitted).
 
 
 40
 1. Reasonableness of the Secretary's Construction
 
 
 41
 The Secretary decided in S.O. 3029 that, if lands tentatively approved for state selection had been leased with an option to buy by the State of Alaska under the state's open-to-entry program prior to the enactment of ANCSA, those lands were withdrawn from Native Alaskan selection as valid existing rights under section 11(a)(2). Secretarial Order No. 3029, 43 Fed.Reg. 55287, 55287-88 (1978). Because the open-to-entry leases are rights leading to the acquisition of title, the Secretary determined that these lands should be excluded from Native Alaskan selection, consistent with 43 C.F.R. 2650.3-1(a). Id. at 55291.
 
 
 42
 A. OTE Purchase Options are "Valid Existing Rights" Under ANCSA
 
 
 43
 The Secretary's construction of "valid existing rights" is consistent with judicial interpretation of section 11(a)(1), 43 U.S.C. Sec. 1610(a)(1). In Aleknagik Natives Ltd. v. United States, 806 F.2d 924 (9th Cir.1986), we reviewed the Secretary's construction of "valid existing rights" under section 11(a)(1). The Secretary had determined that townsite land in Alaska that had been segregated, but not yet subdivided and distributed, was not available for Native Alaskan selection under section 11(a)(1). We held that a municipality's right to the land did not vest at the time of segregation, because it was contingent upon other occupants not taking up those lands under the townsite laws and on the completion and approval of a subdivisional survey. Aleknagik Natives, Ltd. v. United States, 635 F.Supp. 1477 at 1489 (D.Alaska 1985). The Secretary concluded that the municipalities had an entitlement to the lands under the townsite laws from the time the lands were segregated from the public domain, thus creating "valid existing rights" under section 11(a)(1). Id. In accepting the Secretary's construction, we stated:
 
 
 44
 The term "valid existing rights" does not necessarily mean present possessory rights, or even a future interest in the property law sense of existing ownership that become possessory upon the expiration of earlier estates. Legitimate expectations may be recognized as valid existing rights, especially where the expectancy is created by the government in the first instance.
 
 
 45
 Aleknagik Natives Ltd. v. United States, 806 F.2d at 926-27. Similarly, the holders of conditional purchase options granted under the Alaska Statehood Act have legitimate expectations in obtaining title to land that should be protected as "valid existing rights."
 
 
 46
 The Secretary's construction is based upon 43 C.F.R. Sec. 2650.3-1(a), which draws a fundamental distinction between temporary rights, such as leases, and rights leading to the acquisition of title, such as purchase options. This construction is consistent with the Supreme Court's interpretation of the phrase in the context of the federal homestead laws. In Stockley v. United States, 260 U.S. 532, 43 S.Ct. 186, 67 L.Ed. 390 (1923), a Presidential Order withdrew from appropriation under the Homestead laws certain lands, "subject to existing valid claims." Id. at 536, 43 S.Ct. at 187. The Supreme Court found that a homesteader's lawful entry upon land subject to homesteading was excepted from this withdrawal order. Id. at 544, 43 S.Ct. at 189. The Supreme Court explained:
 
 
 47
 Obviously this means something less than a vested right, such as would follow from a completed final entry, since such a right would require no exception to insure its preservation. The purpose of the exception evidently was to save from the operation of the order claims which had been lawfully initiated and which, upon full compliance with the land laws, would ripen into a title.
 
 
 48
 Id. Because the preliminary entry gave the entryman an exclusive right to possession, his inchoate right to proceed to patent was protected. Id. Just like a homesteader's preliminary entry, the grant of a conditional purchase option ripens into title upon compliance with the State of Alaska's land laws. See Alaska Stat. Sec. 38.05.077 (option to purchase tentatively approved land may be exercised by causing survey to be made of entry and paying negotiated price). The Supreme Court's analysis in Stockley supports the conclusion that a grant of a conditional purchase option is a "valid existing right."
 
 
 49
 OTE conditional purchase options thus satisfy the requirements of a valid existing right. Because they are granted by the State of Alaska pursuant to an Act of Congress, they create legitimate expectations of property interests. In addition, they are rights leading to the acquisition of title. We conclude, therefore, that the Secretary's construction of "valid existing rights" under ANCSA to include OTE conditional purchase options is reasonable.
 
 
 50
 b. Land Subject to OTE Purchase Options is Excluded from
 
 Native Selection
 
 51
 The Secretary determined that land subject to OTE purchase options is excluded from Native Alaskan selection under section 11(a)(2), 43 U.S.C. Sec. 1610(a)(2). Secretarial Order No. 3029, 43 Fed.Reg. at 55291. This interpretation is based on the language of 43 C.F.R. Sec. 2650.3-1(a), which excludes from any conveyance of land selected by Native Alaskans any "lawful entries or entries which have been perfected under, or are being maintained in compliance with, laws leading to the acquisition of title." The Secretary's interpretation is reasonable. It avoids the necessity of reconveying land selected by Native Alaskans under ANCSA to an option holder because he has a valid existing right. It also protects the Native Alaskans' rights to their full allotment of land under section 1613 of ANCSA.
 
 
 52
 In Lee v. United States, 629 F.Supp. 721 (D.Alaska 1985), aff'd on other grounds, 809 F.2d 1406 (9th Cir.1987), cert. denied, 484 U.S. 1041, 108 S.Ct. 772, 98 L.Ed.2d 859 (1988), the district court reviewed the Secretary's construction of section 22(b). Section 22(b) protects claims made under the federal homestead laws. 43 U.S.C. Sec. 1621(b). As a result, there was no dispute that these claims were "valid existing rights" under ANCSA. The plaintiffs, however, contended that lands subject to homestead claims were not excluded from Native Alaskan selection under section 11(a)(1), but were conveyed as "subject to" lands under section 14(g). The Secretary construed section 11(a)(1) to require the exclusion of these lands from Native Alaskan selection, even if the claimant had not yet fulfilled all the requirements of federal law to receive a patent. See 43 U.S.C. Sec. 1621(b). The district court found that this construction was reasonable because " 'all conveyances issued under the act shall exclude any lawful entries or entries which have been perfected under, or are being maintained in compliance with, laws leading to the acquisition of title.' " Lee v. United States, 629 F.Supp. at 731 (quoting 43 C.F.R. Sec. 2650.3-1(a)). Because the Secretary determined the validity of all homestead claims, and because valid homestead claims would defeat Native Alaskans' ownership rights, land subject to homestead claims was excluded from selection by and conveyance to Native Alaskans. Id. at 731-32; see also Aleknagik Natives, Ltd. v. United States, 635 F.Supp. at 1488-90 (employing similar reasoning to exclude federal townsite lands from selection under section 11(a)(1), 43 U.S.C. Sec. 1610(a)(1)).
 
 
 53
 Like land subject to homestead claims in Lee v. United States, land subject to OTE purchase options is excluded from Native Alaskan selection by the Secretary's application of 43 C.F.R. Sec. 2650.3-1(a). Under ANCSA, the Secretary is directed to issue a patent to federal lands "[i]mmediately after selection by a Village corporation ... which the Secretary finds is qualified for land benefits under this chapter." 43 U.S.C. Sec. 1613(a). Native Village corporations have rights to receive patents to a limited amount of land based on their census population in 1970. See id. Sec. 1613(a). Their rights to obtain title to land withdrawn from State selection by section 11(a)(2), id. Sec. 1610(a)(2), are even more limited. See id. Sec. 1611(a)(1). Because OTE purchase options are valid state-created rights under section 11(a)(2), land subject to OTE purchase options would count against the Native Village corporations' conveyance limit if available for selection by Native Alaskans. See id. Sec. 1613(a). If the options are exercised, Native Alaskans would be divested of their fee interest in the OTE land and their allotment under ANCSA would be reduced commensurately. This result does not effect "maximum participation by Natives in decisions affecting their rights and property." Id. Sec. 1601(b); see also Lee v. United States, 629 F.Supp. at 731-32 (discussing the effect of including section 22(b) lands in conveyances under section 14(a)). In contrast, the exclusion of land subject to OTE purchase options, pursuant to section 11(a)(2), 43 U.S.C. Sec. 1610(a)(2), gives Native Alaskans complete fee ownership of all land selected under ANCSA. While still subject to valid state and federal rights pursuant to section 14(g), id. Sec. 1613(g), title to land selected by Native Alaskans will remain intact. Thus, the Secretary's application of 43 C.F.R. Sec. 2650.3-1(a) to exclude land subject to purchase options from Native Alaskan selection is reasonable.
 
 
 54
 c. Consistency of the Construction
 
 
 55
 SNA asserts that the Department of the Interior's construction of "valid existing rights" with regard to OTE lands has been inconsistent. It notes that two ANCAB opinions held that purchase options are not valid existing rights under ANCSA. See Appeal of Eklutna, ANCAB VLS 75-10 (Dec. 10, 1976); Appeal of Seldovia, ANCAB VLS 75-14, 75-15 (June 9, 1977).
 
 
 56
 The Secretary's construction of "valid existing rights," promulgated in S.O. 3016 and re-adopted in S.O. 3019, was intended to resolve the uncertainty caused by the two ANCAB decisions cited by SNA. See Secretarial Order No. 3016, 85 Interior Dec. 1 (1977); Secretarial Order No. 3029, 43 Fed.Reg. 55287 (1978). In promulgating S.O. 3016 and S.O. 3029, the Secretary was acting within his paramount power; he was not bound by the construction formulated by a subordinate body such as ANCAB. See Ideal Basic Indus. v. Morton, 542 F.2d 1364, 1367-68 (9th Cir.1976) ("[The Secretary] has a continuing jurisdiction with respect to these lands until a patent issues, and he is not estopped by the principles of res judicata or finality of administrative action from correcting or reversing an erroneous decision by his subordinates or predecessors in interest."). Moreover, the Secretary's construction of "valid existing rights" in S.O. 3016 and S.O. 3029 conformed to a long line of Interior Department decisions construing that phrase. See, e.g., Solicitor's Opinion M-36910 (Supp.), 88 Interior Dec. 909, 912 (1981) (under Federal Land Policy and Management Act, 43 U.S.C. Secs. 1701-1782, valid existing rights are "those rights short of vested rights that are immune from denial or extinguishment by the exercise of secretarial discretion"); Authority to Extend Coal Prospecting Permits: Effect of Sec. 4 of the Federal Coal Leasing Amendments Act of 1975, Solicitor's Opinion No. M 36894, 84 Interior Dec. 415, 416-17 (1977) ("Both Congress and the Executive Branch have used the phrase 'valid existing right' ... when they intended to terminate the opportunity for a person to acquire new rights, but intended to allow those who had initiated but had not fully earned a claim to continue to pursue those rights."); Executive Withdrawal Order of November 26, 1934, as Affecting Taylor Grazing Act and Other Prior Legislation, 55 Interior Dec. 205, 210 (1935) ("[A]ll prior valid applications for entry, selection, or withdrawal should be considered as constituting valid existing rights...."); Williams v. Brening, 51 Interior Dec. 225, 226 (1925) ("[T]he withdrawal here in question saved 'any valid existing rights in and to' the lands so withdrawn, and a preferred right which had been earned, although not actually awarded, prior to the withdrawal is entitled to protection.").
 
 
 57
 Even if the Secretary's construction of "valid existing rights" is consistent with prior interpretations, SNA contends that the Secretary's decision to exclude OTE lands from Native Alaskan selection under section 11(a)(2) is a product of this litigation. The Secretary's exclusion of OTE lands from Native Alaskan selection, however, pre-dated this litigation. The exclusion of OTE lands from Native Alaskan selection originated in S.O. 3029, issued in 1978. See Secretarial Order No. 3029, 43 Fed.Reg. at 55291 (Secretary concludes "that lands subject to open-to-entry leases which were issued prior to December 18, 1971, and which are within a Native selection should not be included in or counted against lands conveyed to Native corporations.").
 
 
 58
 S.O. 3029 did, however, reverse the Secretary's conclusion in S.O. 3016 that OTE lands would be conveyed as "subject to" lands under Sec. 14(g), 43 U.S.C. Sec. 1613(g). See Secretarial Order No. 3016, 85 Interior Dec. 1, 8 (1977). We must examine the reversal of this interpretive rule.
 
 
 59
 When an agency reverses a prior policy or statutory interpretation, its most recent expression is accorded less deference than is ordinarily extended to agency determinations. INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987); Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981). The agency will be required to show not only that its new policy is reasonable, but also to provide a reasonable rationale supporting its departure from prior practice. See Motor Vehicles Mfrs. Ass'n of the United States v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (overturning an agency reversal because the agency had provided no explanation for its change in policy); Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers, 861 F.2d 1124, 1130-34 (9th Cir.1988) (en banc) (upholding an agency reversal after finding that the previous policy had been unworkable in practice.). However, a reversal of prior policy or statutory interpretation does not wholly vitiate deference to agency determinations. NLRB v. International Ass'n of Bridge Structural and Ornamental Ironworkers, 434 U.S. 335, 351, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). "Although the consistency of an agency's interpretation is one relevant factor in judging its reasonableness, an agency's interpretation ... is nevertheless entitled to deference, so long as the agency acknowledges and explains the departure from its prior views." Mobil Oil Co. v. EPA, 871 F.2d 149, 152 (D.C.Cir.1989) (emphasis in original).
 
 
 60
 The Secretary recognized that exclusion of OTE lands from Native Alaskan selection would reverse S.O. 3016. Secretarial Order No. 3029, 43 Fed.Reg. at 55291. The Secretary noted that exclusion would be consistent with 43 C.F.R. Sec. 2650.3-1(a). Id. In addition, exclusion allows the State of Alaska to determine whether entrymen have satisfied the state law conditions for the exercise of their options. Id. "If the lessee fails to exercise the option to purchase, the affected Native corporation can either have the land conveyed as part of its original entitlement or, if the entitlement is otherwise satisfied, then by exchange." Id. Furthermore, exclusion is consistent with the treatment of federal homestead claims under section 11(a)(1), which are essentially options to buy that can be exercised against the United States by meeting the statutory criteria. Id. Because the Secretary acknowledged and explained the modification of S.O. 3016, his construction can be accorded the same deference ordinarily given to an administrative interpretation of statutory language.
 
 
 61
 2. Retroactive Application of the Secretary's Construction
 
 
 62
 S.O. 3029 was applied to all non-final proceedings at the date of its promulgation. Valid Existing Rights Under the Alaska Native Claims Settlement Act: Departmental Manual Release No. 2246, 601 DM 2 (March 27, 1980). SNA contends that the retroactive application of S.O. 3029 is impermissible.
 
 
 63
 SNA's first argument is that retroactive application of S.O. 3029 is a taking without due process of law in violation of the fifth amendment. SNA asserts that its property interest in the lands at issue vested when the entrymen failed to appeal the ANCAB decision. See 43 C.F.R. Sec. 4.5(a)(2) (giving Secretary authority to review ANCAB decision). As a result, this interest could not be taken away without payment of just compensation. See U.S. Const. amend. V.
 
 
 64
 This argument fails because SNA has no vested property right in the finality of an ANCAB decision. See Reed v. Morton, 480 F.2d 634, 642-43 (9th Cir.) (Secretary may reopen administrative decision if legal title remains in United States), cert. denied, 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). As long as legal title to land remains in the United States, "there is continuing jurisdiction in the Department [of the Interior] to consider all issues in land claims." Schade v. Andrus, 638 F.2d 122, 124-25 (9th Cir.1981); see also Ideal Basic Indus. v. Morton, 542 F.2d at 1368 ("So long as the legal title remains in the Government, the Secretary has the power and duty upon proper notice and hearing to determine whether the claim is valid."); cf. Best v. Humboldt Placer Mining Co., 371 U.S. 334, 337-38, 83 S.Ct. 379, 382-83, 9 L.Ed.2d 350 (1963) (discussing mining claims). Because patents to the OTE lands had not issued as of the date of S.O. 3029's retroactive application, legal title remained in the United States despite selection by the Native Alaskans. See 43 U.S.C. Sec. 1613(a) (1982); Reed v. Morton, 480 F.2d at 642 ("[P]rior to patent the Secretary retains jurisdiction over public lands.").
 
 
 65
 SNA's second argument is that S.O. 3029 may not be applied retroactively because it constitutes administrative rulemaking that is subject to the notice and comment provisions of the Administrative Procedure Act (APA). 5 U.S.C. Sec. 553 (1988). Interpretive rules, however, are excepted from the procedural requirements of section 553. See 5 U.S.C. Sec. 553(b)(A), (d)(2). Interpretive rules are rules that " 'merely clarify or explain existing law or regulations.' " Alcaraz v. Block, 746 F.2d 593, 613 (9th Cir.1984) (quoting Powderly v. Schweiker, 704 F.2d 1092, 1098 (9th Cir.1983)). These rules "are essentially hortatory and instructional in that they go more 'to what the administrative officer thinks the statute or regulation means, when applied in particular, narrowly defined, situations." Id. (quoting Gibson Wine Co. v. Snyder, 194 F.2d 329, 331 (D.C.Cir.1952)). Substantive rules, on the other hand, " 'are those which effect a change in existing law or policy.' " Id. (quoting Powderly v. Schweiker, 704 F.2d at 1098)).
 
 
 66
 The Secretary's decision that OTE conditional purchase options are "valid existing rights" under ANCSA did not effect a change in existing law or policy. Instead, S.O. 3029 interpreted an existing statute and "clarified the law's terms as applied situationally." Id. Because S.O. 3029 was an exercise of the Secretary's interpretive authority, it was not subject to the notice and comment provisions of the APA.
 
 
 67
 SNA's third argument is that the Secretary is equitably estopped from retroactively applying S.O. 3029. When S.O. 3016, which defined OTE purchase options as "valid existing rights" under section 14(g), was issued, representatives of SNA became concerned that it would be applied to reverse the two favorable ANCAB decisions. SNA received two responses from the Department of the Interior in response to its inquiries. The first, dated December 28, 1977, was signed by James Joseph, an Undersecretary of the Department of the Interior. It stated that the ANCAB decisions would "be implemented as originally decided," so SNA would not be deprived of its benefits. Plaintiff's Brief in Support of Motion for Summary Judgment, Affidavit of Fred Elvsaas, Ex. C. The second, dated March 3, 1978, was signed by Leo Krulitz, the Solicitor of the Department of the Interior. It stated that "[a]ll final prior cases were left unaffected" by S.O. 3016. Id., Ex. D. SNA contends that these communications estop the Department from applying S.O. 3029 retroactively.
 
 
 68
 This court has held that " ' "where justice and fair play require it," estoppel will be applied against the government....' " Watkins v. United States Army, 875 F.2d 699, 706 (9th Cir.1989) (en banc) (quoting Johnson v. Williford, 682 F.2d 868, 871 (9th Cir.1982) (quoting United States v. Lazy FC Ranch, 481 F.2d 985, 988-89 (9th Cir.1973))). A party seeking to assert equitable estoppel against the government must establish two additional elements beyond those required for traditional estoppel: first, " ' "affirmative misconduct going beyond mere negligence" ' "; and second, a " ' "serious injustice," ' " the imposition of liability for which will not unduly damage the public's interest. Id. at 707 (quoting Wagner v. Director, Fed. Emergency Management Agency, 847 F.2d 515, 519 (9th Cir.1988) (quoting Morgan v. Heckler, 779 F.2d 544, 545 (9th Cir.1985))). Affirmative misconduct requires "an affirmative misrepresentation or affirmative concealment of a material fact by the government." Id.
 
 
 69
 In this case, SNA cannot prove affirmative misconduct by the Department of the Interior. S.O. 3029 states:
 
 
 70
 This Order is not intended to disturb any administrative determination contained in a final decision by any duly authorized departmental official. The question of retroactive application of this Order shall be addressed by the solicitor under proceedings which shall be announced by him within 30 days of this Order's effective date.
 
 
 71
 Secretarial Order No. 3029, 43 Fed.Reg. at 55287. By its express terms, S.O. 3029 left open the question of retroactive application. An ANCAB order suspending the proceedings in SNA's administrative appeal informed SNA of the potential retroactive application of the S.O. 3029. See Appellant's Opening Brief, at 47. Thus, the events reflect a change in an interpretive ruling that was ignored by SNA, rather than an affirmative misrepresentation upon which it relied.
 
 
 72
 SNA's fourth argument is that the Secretary incorrectly applied the law of retroactivity. This court has developed a five-part analysis to balance the interests in considering the retroactive application of an administrative construction. Oil Workers Int'l Union, Local 1-547 v. NLRB, 842 F.2d 1141, 1145 (9th Cir.1988). These factors are:
 
 
 73
 (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 
 
 74
 Id.
 
 
 75
 As the district court noted, S.O. 3029 clarifies a previously unsettled area of the law, rather than representing "an abrupt departure from well-established administrative practice." Although SNA relied on the ANCAB decisions in negotiating a land trade that included the OTE land with the State of Alaska, this agreement was not signed until May 1979--after the publication of S.O. 3029 notified SNA that retroactive application was possible. See Plaintiff's Brief in Support of Motion for Summary Judgment, Affidavit of Fred Elvsaas, at 7. Furthermore, this case involves a contest between two private parties. As the district court noted, "[o]nly one of these groups can succeed to title; in simple terms, one group will win and the other must lose." As a result, the burden factor is not helpful. Finally, retroactive application is necessary to preserve the entrymen's rights under ANCSA. Retroactive application thus effects congressional intent by preserving valid existing rights. See 43 U.S.C. Secs. 1610(a), 1613(g). For these reasons, the Secretary's retroactive application of S.O. 3029 is consistent with the legal principles set forth in Oil Workers Int'l Union, Local 1-547 v. NLRB.
 
 
 76
 In its final argument on this issue, SNA asserts that the Secretary erred in applying S.O. 3029 to the ANCAB decision involving its lands, see Appeal of Seldovia, 84 Interior Dec. 349 (1977), 2 ANCAB 1, VLS 75-14, 75-15, and not applying it to the ANCAB decision involving Eklutna Native Village Corporation's lands. See Appeal of Eklutna, ANCAB VLS 75-10. The lands in dispute in Eklutna, however, unlike the lands in dispute in Seldovia, had already been conveyed. See Solicitor's Opinion No. 2246, 45 Fed.Reg. 1692. As a result, the Department no longer had jurisdiction over those lands. See Schade v. Andrus, 638 F.2d at 124-25. We conclude that the Secretary did not err in applying S.O. 3029 retroactively.
 
 II. State Selection of OTE Land
 
 77
 SNA contends that the selection and tentative approval of the OTE land violated the Alaska Statehood Act. SNA notes that only "vacant, unappropriated and unreserved" lands could be selected by the State of Alaska pursuant to section 6(b) of the Alaska Statehood Act, 72 Stat. 339 (1958), 48 U.S.C. note prec. Sec. 21 (1982). SNA asserts that pursuant to section 6(b), a factual finding that lands are vacant, unappropriated and unreserved must be made before the Secretary can give tentative approval to the State of Alaska's selection. Because such a factual finding was not made with regard to the OTE lands, SNA argues that the Secretary's tentative approval of the State's selection is void. SNA relies on State of Alaska v. Udall, 420 F.2d 938 (9th Cir.1969), cert. denied, 397 U.S. 1076, 90 S.Ct. 1522, 25 L.Ed.2d 811 (1970), and Edwardsen v. Morton, 369 F.Supp. 1359 (D.D.C.1973), for this proposition.
 
 
 78
 SNA's argument is unpersuasive. Alaska v. Udall involved a challenge to a selection made by the State of Alaska by a Native Village on a claim of aboriginal title. We commented in Alaska v. Udall that the enactment of ANCSA "would probably resolve all or most of the issues involved" in that litigation. 420 F.2d at 940. As the district court recognized in Edwardsen v. Morton, 369 F.Supp. at 1377-78, ANCSA extinguished all claims of "aboriginal right, title, use, or occupancy of land or water areas in Alaska." 43 U.S.C. Sec. 1603(c). In addition, ANCSA validated all tentative approvals of State selections made pursuant to section 6(g) of the Alaska Statehood Act. 43 U.S.C. Sec. 1603(a). In consideration for the extinguishment of aboriginal title, Native Alaskans were granted $962,500,000 and approximately 40,000,000 acres of land. H.R.Rep. No. 523, 92d Cong., 1st Sess. 4, reprinted in 1971 U.S.Code Cong. & Admin.News 2192, 2195. Thus, SNA cannot assert its right to the OTE lands based on its prior use and occupancy. United States v. Atlantic Richfield Co., 612 F.2d at 1134.
 
 III. Publication of Notice of Selection
 
 79
 43 C.F.R. Sec. 2627.4(c) requires the publication of a notice of State selection of federal land. This notice must be published "in the vicinity of the land affected thereby." 43 C.F.R. Sec. 1824.1-1(a). SNA charges that the State failed to publish a notice of the Kachemak Bay selections in the vicinity of Kachemak Bay.
 
 
 80
 Under 43 C.F.R. Sec. 1824.1-1(a), the notice must be published in "a newspaper of established character and of general circulation." The Bureau of Land Management has discretionary authority to determine which newspapers satisfy the publication requirement. 43 C.F.R. Sec. 1824.1-2(a). In the instant matter, the BLM published the notice in the Anchorage Daily News and the Anchorage Times. SNA does not contend that these newspapers lack established character and of general circulation. As a result, this challenge must fail.
 
 IV. Eleventh Amendment Bar
 
 81
 The allegations in SNA's sixth cause of action described conduct by the State of Alaska contrary to state law. The complaint provides as follows:
 
 
 82
 47. The State of Alaska issued patents to the individual defendants for the "open to entry" tracts described hereinabove without receiving payment therefor of the fair market value of said tracts as required by state law.
 
 
 83
 48. The State of Alaska did not hold public hearings in the area of the "open to entry" lands in question in this case before declaring said lands as "open to entry" lands. Failure to hold such hearings was a violation of state law.
 
 
 84
 49. The procedures by which state open to entry leases and patents were issued to the individual defendants herein were so flawed that any rights held by the individual defendants are not valid existing rights within the meaning of Secs. 11 and 14 of A.N.C.S.A. (43 U.S.C. Secs. 1610 and 1613).
 
 
 85
 The district court dismissed this cause of action as barred by the eleventh amendment. SNA argues that this dismissal was in error because the relief requested is against the federal government: an order from the court directing "the federal government to convey the lands in question to it." Appellant's Opening Brief, at 43.
 
 The eleventh amendment provides:
 
 86
 The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state.
 
 
 87
 U.S. Const. amend. XI. Although the eleventh amendment expressly refers to suits brought against a state by citizens of another state, the Supreme Court has interpreted its language as applying to actions brought against a state by citizens of the same state. Papasan v. Allain, 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Furthermore, a corporation chartered by Congress may not sue a state. Smith v. Reeves, 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140 (1900). This bar exists whether the relief sought is legal or equitable. Papasan v. Allain, 478 U.S. at 276, 106 S.Ct. at 2939 (citing Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984)).
 
 
 88
 Because SNA has named the Director of Forest Land and Water Management for the State of Alaska as a defendant, rather than the State of Alaska itself or one of its agencies, the court must determine whether the limited exception to the eleventh amendment recognized in Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), applies. In Ex Parte Young, the Supreme Court concluded that the eleventh amendment did not bar a suit for equitable relief against a state official whose actions were taken under the authority of an unconstitutional state enactment. Id. at 159-60, 28 S.Ct. at 453-54. Ex Parte Young, however, "does not foreclose an Eleventh Amendment challenge where the official action is asserted to be illegal as a matter of state law alone." Papasan v. Allain, 478 U.S. at 277, 106 S.Ct. at 2940. The bar operates because a federal court's grant of relief against state officials on the basis of state law "does not vindicate the supreme authority of federal law." Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Id.
 
 
 89
 SNA alleged a violation of state and not federal law in its sixth cause of action. As a result, the eleventh amendment bars this action.
 
 
 90
 This court recently confronted the scope of eleventh amendment immunity to suits brought by Native Alaskans based on state-created rights against the State of Alaska. In Native Village of Noatak v. Hoffman, 896 F.2d 1157 (9th Cir.1990), the plaintiffs, three Native Alaskan Villages, brought an action against the Commissioner of the Department of Community and Regional Affairs of the State of Alaska (the Commissioner). The plaintiffs based their action on an Alaska law that provided that "the state shall pay $25,000 to a Native Village government for a village which is not incorporated as a city under this title." Id. at 1159 (citing Alaska Stat. Sec. 29.89.050 (1980)). In their first cause of action, the plaintiffs alleged that the Commissioner was guilty of invidious racial discrimination against the individual members of the Native Alaskan Villages in violation of the federal constitution and 42 U.S.C. Sec. 1983. Id. The plaintiffs asserted as a second cause of action that the dilution of funds available violated federal laws and policy intended to further tribal self-government. Id. The plaintiffs alleged in count three of their complaint that the Commissioner's conduct violated 25 U.S.C. Sec. 476. Id. The plaintiffs alleged in their fourth cause of action that their freedom of religion and association under the first amendment was violated by the Commissioner's action. Id. at 1159-1160. The plaintiffs also alleged several pendent state claims. The district court dismissed the action as barred by the eleventh amendment.
 
 
 91
 We reversed and remanded, holding that eleventh amendment immunity does not apply to suits brought by Native Alaskans against the State of Alaska. Id. at 1164-1165. We construed Article I, Section 8, Clause 3 of the Constitution, as providing "consent by the states to federal jurisdiction" in suits by Indian tribes. Id. at 1162 (quoting U.S. Const. art. I, Sec. 8, cl. 3). We reasoned that, because "Indian affairs are sui generis and ... this unique area concern[s] relations with non-foreign governmental units, the surrender of state sovereignty carried with it a surrender of immunity from suit." Id. at 1164.
 
 
 92
 SNA, however, is not a "non-foreign governmental unit." SNA is a Native Village corporation. ANCSA describes such an entity as "an Alaska Native Village Corporation organized under the laws of the State of Alaska as a business for profit or nonprofit corporation to hold, invest, manage and/or distribute lands, property, funds, and other assets for and on behalf of a Native Village in accordance with the terms of this chapter." 43 U.S.C. Sec. 1602(j). SNA's duties are created, defined and limited by ANCSA. See, e.g., 43 U.S.C. Sec. 1607 (organization of village corporations); id. Sec. 1611 (selections by village corporations); id. Sec. 1613 (conveyances to village corporations). Unlike the Native Alaskan Villages in Native Village of Noatak v. Hoffman, SNA is not a governmental unit with a local governing board organized under the Indian Reorganization Act, 25 U.S.C. Secs. 461-479 (1982). Because SNA is not a governing body, it does not meet one of the basic criteria of an Indian tribe. Montoya v. United States, 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521 (1901); cf. Navajo Tribal Utility Auth. v. Arizona Dept. of Revenue, 608 F.2d 1228, 1231 (9th Cir.1979) (for the purposes of jurisdiction under 28 U.S.C. Sec. 1362, " 'Native corporations are not tribes or bands.' ") (quoting Cape Fox Corp. v. United States, 456 F.Supp. 784, 798 (D. Alaska 1978), rev'd in part and remanded in part, 646 F.2d 399 (9th Cir.1981)).
 
 
 93
 In summary, we conclude that Native Village of Noatak v. Hoffman does not apply to a Native Village corporation organized under ANCSA. Because SNA alleges a violation of state and not federal law, the limited exception to eleventh amendment immunity recognized in Ex Parte Young is not applicable. The district court did not err in dismissing SNA's sixth cause of action against the Director of Forest Land and Water Management for the State of Alaska because it is barred by the eleventh amendment.
 
 CONCLUSION
 
 94
 Conditional purchase options are "valid existing rights" under ANCSA. The exclusion of land subject to OTE conditional purchase options from selection under section 11(a)(2) of ANCSA furthers congressional intent by protecting "valid existing rights." A Native Village corporation is barred by the eleventh amendment from suing an Alaskan state official for violation of Alaskan law.
 
 
 95
 AFFIRMED.
 
 
 
 *
 Manuel Lujan, Jr., the current Secretary of the Interior, is substituted for former Secretary Hodel. See Fed.R.App.P. 43(c)(1)